**MARYLAND CASUALTY COMPANY, Pan American Insurance Company, B. B. Campbell, Individually and d/b/a Campbell Insurance Agency, Appellants,**

v.

**PALESTINE FASHIONS, INC., Kay's Ladies and Children's Shop, Inc., R. H. Johnson, E. W. Hickman, Individually and d/b/a the Bootery and John L. Bates, Appellees.**

No. 147.

Court of Civil Appeals of Texas.

Tyler.

July 8, 1965.

Rehearing Denied Sept. 16, 1965.

Tom. B. Ramey, Jr., Ramey, Brelsford, Hull & Flock, Tyler, for appellants.

John L. Bates, Waco, for appellees.

SELLERS, Justice.

The appellees herein brought this suit against the appellants to recover upon two insurance contracts for $10,000.00 each, covering the stock of merchandise of E. H. Hickman, doing business under the name of the Bootery. This business was located in the City of Palestine.

There was no question but that B. B. Campbell, who was the local agent of the insurance companies, issued the policies covering the contents of the Bootery and that the premium had been paid. At no time did B. B. Campbell cancel the policies prior to the time of the fire, which occurred on April 14, 1963. The companies denied liability on the insurance contracts for the reason that there had been a violation of the provisions of the same in that a change of ownership of the Bootery rendered the insurance void by its own terms.

The plaintiffs admit a change of ownership, but allege facts which they say establish a waiver of the provisions of the policies with reference to change of ownership.

The case was tried to a jury and the court submitted, among others, these issues to the jury:

"SPECIAL ISSUE NO. I

"Do you find from a preponderance of the evidence that prior to the fire in question, the defendant Maryland Casualty Company had waived the provision of its policy providing for termination of liability thereunder following a change in ownership of the insured property?

"ANSWER Yes

"SPECIAL ISSUE NO. II

"Do you find from a preponderance of the evidence that prior to the fire in question, the defendant Pan American Insurance Company had waived the provision of its policy providing for termination of liability thereunder fol-

lowing a change in ownership of the insured property?

"ANSWER Yes."

The main issue here for consideration is, Does the evidence authorize such waiver and authorize the trial court judgment which was in favor of all the plaintiffs, jointly and severally, as their interest appeared, and decreed that John L. Bates recover the $20,000.00, with a lien in favor of R. H. Johnson for the sum of $16,500.00.

We are of the opinion that the evidence fully supports the finding of the jury on the issue of waiver by the companies of the forfeit clause of the contract because of the change of ownership.

In the case of New York Underwriters Ins. Co. v. Brittain et al., Tex.Civ.App., 62 S.W.2d 168, 170, it is held:

"Nor is it necessary for us to rest the affirmance of this case alone upon the question of novation of the contract. We think the facts show a complete waiver upon the part of appellant of any right it ever had to insist upon the forfeiture provisions of the policy. It is well settled by the decisions of our courts that, when an insurance agent with power to bind his company, and with full knowledge of the facts, does some unequivocal act showing an intention to treat the policy as valid and binding after the date on which, under its terms, it would have become forfeited, such conduct will amount to waiver of the forfeiture provisions. 24 Tex.Jur. p. 829; Stone v. Brady Mutual Life Ins. Ass'n (Tex.Civ.App.) 2 S.W.(2d) 538; Equitable Life Assur. Soc. v. Ellis, 105 Tex. 526, 147 S.W. 1152, 152 S.W. 625; Dunken v. Aetna Life Ins. Co. (Tex.Civ.App.) 221 S.W. 691. See, also, Scott v. Law Union & Rock Ins. Co., 12 S.W.(2d) 147, where, in an opinion by Judge Harvey, the Commission of Appeals, Section A, specifically held that a general agent for a fire insurance company had

authority to waive for the company, after the policy was issued, the benefits of a stipulation therein for forfeiture of the policy in case of a change of interest, title, or possession of the insured property."

In the case of British America Assur. Co. et al. v. Francisco, 58 Tex.Civ.App. 75, 123 S.W. 1144, it is held:

"Where insurer's agent was told that the property had been sold, and that, on payment of the cash consideration, the deed which was being held in escrow would be delivered to the purchaser, and such agent did not object, but made a memorandum of the information, and requested notification of the consummation of the sale, this constituted a waiver of a provision of the policy rendering it void in case of transfer without insurer's consent."

When these rules are applied to the facts of this case there can be no doubt that a waiver of the no transfer provision in the policies was made.

Mr. Campbell, the agent who wrote the insurance, testified, among other evidence, as follows:

"A  On or about April 1st Mr. Hickman called me at my office and stated that The Bootery had been sold to Mr. R. H. Johnson. He asked that I issue endorsements making mention of the transfer of ownership, which I did. In the process of issuing that endorsement—it was a very small endorsement and takes a very short time to do it—before I had completed it, I had it in the typewriter, Mr. Hickman called and said that the assets of The Bootery had been sold, and not to show R. H. Johnson as the owner; that I would be advised later as to who the owner was. That was the extent of the first conversation. And the second conversa-

tion was within a very few minutes, from Mr. Hickman, on or about April 1, 1963.

"Q What did he tell you as to the name of the new owners?

"A He stated that a new name had not been decided on the new firm.

"Q Did he mention to you that the firm was being incorporated?

"A I believe that he did mention that an application, or something of that nature, or a charter would be asked for.

"Q What did you tell Mr. Hickman?

"A I asked him to notify me as soon as he possibly could as to the new name. And I asked him at that time if he knew whether or not the new owners desired that I continue to carry the insurance on the contents. He stated that he did not know, but that he would talk with them and advise me later. I told him that I would need that information in order to make a proper refund to him for the unearned portion of the premiums on the two policies involved.

"*   *   *

"Q Were you on April 1st acquainted with this provision in this policy?

"A Yes, sir.

"Q Did you call this provision to the attention of Mr. Hickman?

"A Only in the sense that he was to advise me the name of the new owner, which he could not and did not do.

"BY MR. RAMEY: May our objection go to all of this, Judge?

"BY THE COURT: Sir?

"BY MR. RAMEY: May our objection go to all of these questions on this thing, in connection with that?

"BY THE COURT: You may have a running bill on that particular portion, when he gets out of it you don't.

"BY MR. BATES:

"Q All right. You say you advised him only to the extent of the conversation you mentioned. You did not specifically tell him, 'This places your policy in jeopardy,' or any words to that effect.

"A May I state that inasmuch as he had sold it I saw no reason to tell him that. I did not know who the new owners were.

"*   *   *

"BY MR. BATES:

"Q Mr. Campbell, did Mr. Hickman on that date tell you to cancel those two policies?

"A No, sir.

"Q Had you on April 1st—between April 1st and the 14th did any party to this lawsuit call, write or otherwise contact you and tell you to cancel these policies?

"A No, sir, about a week after the April 1st conversation with Mr. Hickman I called him again to try to determine who the new owners were, but he still could not tell me at that time.

"Q What did he tell you at that time?

"A He said that a name had not been decided for the new business. I said that I could not issue an endorsement.

"Q Did you at that time, Mr. Campbell, cancel those policies or take any action?

"A  I did not.

"Q  What did you tell Mr. Hickman?

"A  I merely told him that I needed the information as to whether or not I was to continue the coverage, and if so who the new owners would be.

"Q  Well,—

"A  But he could not furnish me with that information.

"Q  In the meantime what did you do with the policies and with the information concerning that?

"A  One was in the hands of the East Texas National Bank, the other was in the hands of Mr. Hickman.

"Q  What I mean—with the situation, did you take any further action at that time?

"A  I don't know of any further action I could have taken.

"Q  Well, I mean did you cancel it, or did you tell him anything further than that?

"A  I told him that I would make a proper refund based on the date of the sale.

"Q  But other than that that's all you told him?

"A  That is all.

"Q  And he did not on that date tell you to cancel the policies did he?

"A  No, sir."

Mr. Hickman, the owner of the Bootery before it was sold to Mr. Johnson, testified as follows:

"A  Mr. R. H. Johnson had a chattel mortgage on the contents of The Bootery and he foreclosed his chattel mortgage for the purpose of forming a corporation to operate The Bootery.

"Q  Was that foreclosure with or without your consent and knowledge?

"A  With my consent.

"Q  With your consent.

"A  It was made prior to the time the note was actually due.

"Q  What are the facts with reference to whether you were going to be a part of the new corporation?

"A  I was to be an officer in the new corporation that was to be formed, but we didn't know the name. We tried to incorporate under the name of The Bootery but it was being used. Another name was chosen but we didn't know if it was being used, that's why Mr. Campbell didn't get the name of the new owner.

"Q  What are the facts with reference to whether you had had some financial difficulties to cause this to occur?

"A  I had had some financial difficulties.

"Q  That brought about this occurrence.

"A  Yes, sir.

"Q  You have heard Mr. Campbell testify. On April 1st did you make such a conversation—or such a call to Mr. Campbell?

"A  Yes, I did.

"Q  What did you tell Mr. Campbell?

"A  I told Mr. Campbell at the time to change the policies from my name to R. H. Johnson's. And then we were in conversation, immediately after that telephone conversation with Mr. Campbell, the three of us, and we were told that it would just be another endorsement—

"MR. REEVES: I believe I'll object to that, Your Honor, the conversation between them, between the three of them after he talked to Mr. Campbell.

"BY THE COURT: He may say what he said—

"BY MR. REEVES: It's hearsay, Your Honor, and we object to it. It's conversation between Mr. Hickman and the other owners, what they were going to do.

"BY THE COURT: I understand that, it will be sustained.

"BY MR. BATES: I'll rephrase the question.

"Q  Subsequent to your first telephone call to Mr. Campbell what facts had occurred in relation to a change of ownership?

"A  The new corporation was to be formed, and since we hadn't decided on a name I immediately called Mr. Campbell back and told him to wait on that and not make R. H. Johnson the new owner, but I would have to give him a new name at a later date when we knew what it was.

"Q  As a matter of fact, the culmination you might say, of that new corporation occurred within a fairly few minutes after that conversation did it not?

"A  That's right.

"Q  That was the time at which a deal was made, so to speak, is that correct?

"A  That's right.

"Q  Then approximately how long would you say elapsed between the two telephone conversations to Mr. Campbell?

"A  It couldn't have been more than a half an hour, it was a very brief period of time.

"Q  As a matter of fact it was about time for a cup of coffee wasn't it?

"A  Just about.

"Q  In that second conversation with Mr. Campbell what did you tell him?

"A  I believe I told him we were forming a corporation and we didn't know the name of it yet, but as soon as I knew it I would let him know what the name of it was.

"Q  But you did inform him that we were forming a corporation?

"A  Yes, I did.

"Q  You are certain of that in your own mind, that that information was given to Mr. Campbell.

"MR. REEVES: We object to that, Your Honor.

"BY THE COURT: What?

"MR. REEVES: He said, 'You are certain in your own mind about it.'

"BY MR. BATES: I withdraw the question.

"BY THE COURT: He's your witness, sir.

"BY MR. BATES:

"Q  What other information, if any, did you give to Mr. Campbell other than the fact that a corporation was being formed?

"A  I don't believe I gave him any other information.

"Q  All right. What reason was there that there had to be a delay for a name on the corporation?

"A  Well, we had to get a charter from the Secretary of State, and

we didn't know whether the name Bootery was incorporable or not.

"Q And I believe you testified that information was given to Mr. Campbell did you not?

"A That's right.

"Q All right. Were you acquainted with me on April 1st?

"A Yes, sir.

"Q You were acquainted with my name on April 1st.

"A Yes.

"Q During the period from April 1st to April 14th what was your capacity in connection with the store?

"A I was operator of The Bootery, which of course at that time Kay's Ladies and Children's, Inc. That was a holding corporation until the new one could be formed."

The facts are that Mr. Johnson, who foreclosed on the Bootery, had held a mortgage on the Bootery from the time it began business, and the record discloses that the foreclosure proceedings were had in order to wipe out certain other creditors. After the foreclosure, Mr. Hickman executed a quit claim to all interest in the Bootery to Mr. Johnson. We think the foregoing evidence of Hickman and Campbell show beyond any controversy that Campbell, with knowledge of the facts, waived the provision in the policies for change of ownership to Johnson. He likewise was advised and agreed, in our opinion, to the creation of a new corporation to whom the assets of the Bootery would be transferred by Johnson; and the only thing that was lacking, Hickman and Johnson could not give him the name of the new corporation until it was formed. The first name selected was that of the Bootery, which was in use and the Secretary of State could not issue a charter in the name of the Bootery This

delayed a few days more the granting of the charter and a new application had to be made for Palestine Fashions, which was granted, but the title of the property to the Bootery was not transferred to Palestine Fashions, Inc., until the day after the fire. As a part of the transaction after Johnson became the owner of the title to the Bootery, he conveyed the title to Kay's Ladies and Children's, Inc., as trustee, a defunct corporation, and retained notes and deeds of trusts against the property. Hickman was at all times operating the Bootery in the same place where the insurance was secured right up to the time of the fire.

Appellants complain of the judgment for the reason that none of these parties had any insurance with the appellants at the time of the fire. There was a joint and several recovery by all the appellees against the appellants when the Court granted the motion of appellees for judgment and denied the motion of appellants. It is true that the Court decreed judgment for Bates, as trustee, as majority stockholder of Kay's Ladies and Children's, Inc., a defunct corporation, which corporation was acting in the capacity of trustee for Palestine Fashions, Inc., the present owner for the sum of $20,000.00. The judgment further decrees an equitable lien in favor of appellee Johnson for $16,500.00. This judgment is in keeping with the motion of appellees for judgment jointly and severally as their interest appeared, and it having appeared to the Court that Johnson was entitled to an equitable lien for $16,500.00 and that the Bootery, after the fire, had been transferred to Palestine Fashions, Inc., they were entitled to the balance of the amount recovered and none of the appellees are complaining of this judgment.

We deem it unnecessary to pass on the question of whether the insurance companies had insurance on appellee, Palestine Fashions, Inc. The waiver of no transfer provision was in favor of Johnson; and with that provision waived, the companies' liability on the policies was established. Scott et al. v. Law Union & Rock Ins. Co.,

Limited of London, Tex.Com.App., 12 S.W. 2d 147. In this case, Scott had insurance on his dwelling. He conveyed it to Riddle for cash of $200.00 and vendor's lien notes for the balance of $1,800.00. On the same day, Riddle conveyed the property to Fuquay. After these transfers were made, Scott asked the local agent to change the insurance to Fuquay so his interest would be protected. This the agent agreed to do but did not, and the house was destroyed by fire and the court held Scott entitled to recover the insurance.

"   *   *   *

"The insurance company contends that it is not liable under the policy, on the ground that the conveyance of the insured property by Scott to Riddle and by the latter to Fuquay worked a change of title and interest therein, and because the company neither consented to· such change nor had knowledge thereof, the policy became void by virtue of the provisions of the clause of the policy which has been quoted. The company also denies liability to Fuquay on the ground that no insurance contract respecting said building was ever effected between the company and Fuquay.

"In considering the case, we have not found it necessary to notice whether or not, under the facts, there is any liability to Fuquay on the part of the insurance company. The judgment of the trial court is 'in favor of Fuquay and Scott, jointly, for the full amount of the policy. Scott makes no complaint of this. We shall therefore notice, in discussing the case, only the question of liability of the company to Scott.

"   *   *   *

"We are further of the opinion that what transpired on the occasion of Scott's visit to Rowland, immediately after the execution of the deeds heretofore mentioned, establishes a waiver by Rowland of the policy stipulation in question, in so far as it applied to the change of interest and title which had been effected by said deeds. This waiver bound the insurance company, and that change of interest and title no longer affected the liability of the insurance company to Scott under the insurance contract. The policy, upon the total destruction of the building by fire, became a liquidated demand in the hands of Scott by virtue of the provisions of article 4929 of the Statutes." ·

The appellants complain of the testimony of John L. Bates on cross-examination, as follows:

"Q (By Tom B. Ramey, Jr.) I believe you said, did you not, Mr. Bates, in your deposition, sir, that Mr. Griffin did come over and look at those shoes you had down at The Bootery after the fire, did he not?

"A (By John Bates)   That is correct.

"Q Did you tell us then that he didn't even make an offer of any kind for the—

"A He made an offer of $6,500, but that was totally unacceptable at that time.

"Q All right, sir.

"A I mean I'll put it like this, it was about the same type of offer as we've got in this lawsuit. You consider my offer as unacceptable."

Immediately after the above statement by the witness Bates, counsel for the insurance companies objected; and before they could state their objections, the court sustained the objections and counsel moved that the jury be instructed not to consider the statement which was promptly granted by the trial court. In view of these proceedings, we cannot say that the statement

by the witness was not cured by the court's instruction to the jury not to consider the same.

It will be noticed that the witness did not use the word "compromise," but simply said that his offer to the attorney was unacceptable. The action of the trial court will be sustained.

There are other assignments which we have considered and deem without merit and are overruled.

The judgment of the trial court is affirmed, except as to the provision in the decree allowing interest of 10% on the recovery against Maryland Casualty Company. All parties agree that this percentage should be 6% instead of 10%.